### WALL v. LUNN LAMINATES, INC.

MASTER AND SERVANT—EMPLOYMENT CONTRACT—EQUALLY DIVIDED
COURT.

> Judgment for plaintiff in his action for damages for breach of
> an alleged employment contract as to commissions for sales
> is affirmed by an equally divided court.

Appeal from Oakland; Hartrick (George B.), J.
Submitted October 17, 1957. (Docket No. 8, Calendar No. 47,390.) Decided December 24, 1957.

Case by Thomas F. Wall against Lunn Laminates,
Inc., a New York corporation, for damages on alleged breach of employment contract and for sums
claimed due on commissions. Verdict and judgment
for plaintiff. Defendant appeals. Affirmed by an
equally divided court.

*John J. Sloan* (*Sauer & Girard,* of counsel), for
plaintiff.

*Dykema, Jones, Wheat, Spencer & Goodnow* and
*Howlett, Hartman & Beier,* for defendant.

SHARPE, J. (*for reversal*). This is an action to
recover damages for breach of an alleged contract
of employment. It appears that plaintiff first became acquainted with James S. Lunn, president of
Lunn Laminates, Inc., a New York corporation,

REFERENCES FOR POINTS IN HEADNOTES
3 Am Jur, Appeal and Error § 1160.

when both were cadets at West Point in 1926. They did not meet again until 1953. On or about February 28, 1953, plaintiff advised James S. Lunn that Chevrolet division of General Motors Corporation was soliciting bids for the plastic body on the Corvette automobile.

Subsequent to some preliminary discussion between plaintiff and James S. Lunn, plaintiff entered into an employment contract with defendant. The contract was prepared by plaintiff and accepted by defendant effective March 23, 1953. The contract reads as follows:

"March 18, 1953.

"Lunn Laminates, Inc.
Huntington Station,
Long Island, N. Y.
Attention: Mr. James S. Lunn, Pres.
*"Dear Jim:*

"Confirming and recording the agreement reached in your office yesterday, my understanding of terms and conditions is as follows:

"A. Salary—$5,000 per year.

"B. An expense account to cover travel, entertainment, and other normal sales expense incurred directly in behalf of Lunn Laminates, Inc.

"C. A bonus computed on a biyearly basis as follows: Commissions computed at 5% of gross business written, less salary earned during the period (See A above) and sales expense incurred and paid by Lunn Laminates, Inc., during the period (See B above).

"D. It is understood that my total earnings, not including sales expense chargeable to Lunn Laminates, Inc., under the plan outlined in A, B, and C, above are not to be less than the basic salary of $5,000 per year and are not to exceed an annual rate of $15,000 per year, as computed under C above.

"It is understood that this agreement is effective Monday, 23 March, 1953, for an initial period of 6

months, renewable or renegotiable thereafter as agreeable to both parties.

"A separate sheet lists the credit cards believed necessary in order to reduce the amount of cash required for travel, and sales expense. (I have personal accounts with Hilton Hotels and Statler Hotels.) It is further understood that foreseeable expense for travel, et cetera, will be covered by a drawing account against expenses to be satisfied by return of a reasonably itemized expense book and a periodic cash settlement. Travel by personally owned automobile to be reimbursable at a rate of 7c per mile for actual mileage—all other expense on an actual cost basis.

"It is a great pleasure, and a source of pride, to be associated with Lunn Laminates, and I assure you that I shall spare no effort to secure accounts of a permanent and profitable nature, as outlined in our discussion of yesterday.

"Sincerely yours,
THOMAS F. WALL"

From March 23, 1953, to September 23, 1953, the latter date being the termination date of the contract, plaintiff made numerous calls on defendant's behalf at Chevrolet, Studebaker, Willys-Overland, Oldsmobile, Buick, Ford, and others. Mr. James S. Lunn, on behalf of defendant, by letter dated October 22, 1953, discharged plaintiff as an employee of defendant corporation. This letter was not received by plaintiff until October 27, 1953. The claim of plaintiff is based upon the so-called Corvette account. It appears that defendant specialized in the manufacture of reinforced plastic parts by the bag-molding process while Molded Fiber Glass Body Company manufactured parts by the matched metal die process and was not equipped for bag molding. It also appears that on March 3, 1953, a date prior to plaintiff's contract, defendant submitted a bid to Chevrolet division with respect to the manufacture

of plastic bodies for the Corvette. Defendant did not receive a contract as a result of this bid. The contract for the manufacture of plastic bodies for the Corvette was awarded by Chevrolet division to Molded Fiber Glass Body Company on March 11, 1953. This contract called for production of parts for the initial 300 Corvettes by the bag-molding process.

At a later date defendant received an offer from Molded Fiber Glass Body Company to take over the bag-molding portion of the Corvette program under a subcontract. Defendant company operated under the subcontract from May, 1953, until December 1, 1953, at which time defendant received a prime contract from Chevrolet Division. The prime contract did not involve any change in the character of the work performed by defendant under the subcontract.

Plaintiff's employment continued for a period of approximately 7 months, during which time he received $3,000 in salary and approximately $5,000 in reimbursed expenses.

The cause came on for trial before the court and jury, and at the close of plaintiff's proofs defendant made a motion for a directed verdict. The motion was denied. The cause was eventually submitted to a jury, and the jury returned a verdict in favor of plaintiff in the amount of $11,500. Later defendant made a motion for judgment notwithstanding the verdict based upon the following:

"(a) That the plaintiff's proofs did not establish sufficient evidence from which it could be determined that the plaintiff's efforts were the procuring cause of the contract between Lunn Laminates and Chevrolet Motor Division of General Motors Corporation.

"(b) That the plaintiff's contract declared upon was not in effect at the time of the agreement between Lunn Laminates and Chevrolet Motor Company, and that the order upon which commission is

sought was not 'business written' within the meaning of the contract between the parties."

This motion was also denied. Defendant appeals and urges, in addition to the above reasons, that the court erred in admitting evidence of various activities of plaintiff and transactions in which he engaged in defendant's behalf, which had no connection with the contract upon which commission was sought.

We note that the contract in question is very indefinite as to the duties of plaintiff. Evidence of his activities, known to defendant, were admissible for the purpose of showing the parties' interpretation of such duties, as well as to show that the contract was renewed after the initial 6-months period expired. It is next urged by defendant that:

"1. There is no presumption of renewal of an employment contract in Michigan unless the original contract is for a year, and plaintiff's contract was for an initial period of only 6 months.

"2. Any presumption of renewal would vanish with the introduction of evidence showing renegotiation of the contract, and the record is clear that plaintiff was dissatisfied with his contract and wanted to make changes in his relationship with defendant and its officers.

"3. No presumption of renewal could arise under a contract which required express agreement for renewal."

It is the claim of plaintiff that after the initial 6-months term of the contract on September 23, 1953, he continued to render the same services with the knowledge and consent of defendant without any prior negotiations and the contract was presumed to have been renewed for an additional 6-months term.

For the purpose of the opinion we shall assume, but without so holding, that plaintiff's contract had been renewed for an additional 6-months term. We

do this for the reason that decision in this case is based upon another issue.

Plaintiff urges that where the written contract is silent as to the services to be performed, the question of what services were to be performed and whether the plaintiff performed them were questions of fact for the jury. There seems to be no question that the contract does not definitely state what services were to be performed. Plaintiff testified that his duties were to keep defendant's name before Chevrolet, to follow the bids, and generally promote defendant's business in the automotive industry in the midwest. However, the pivotal question in the case at bar relates to the services rendered by plaintiff, if any, in securing the prime contract with Chevrolet.

Plaintiff claims that he was instrumental in procuring a prime contract with the Chevrolet division of General Motors Corporation for the furnishing of reinforced plastic bodies for their Corvette job, and that he is entitled to compensation based upon the following in his contract:

"C. A bonus computed on a biyearly basis as follows: Commissions computed at 5% of gross business written, less salary earned during the period * * * and sales expense incurred and paid by Lunn Laminates, Inc., during the period."

In considering this claim we have in mind that while the contract is indefinite as to the duties of plaintiff while in the employ of defendant, the salary and bonus that plaintiff is entitled to under the contract are not indefinite. The contract provides for a salary of $5,000 per year and in addition a commission computed at 5% of gross business written with a minimum salary of $5,000 per year and a maximum salary and commission of $15,000 per year.

Plaintiff testified: "My claim here is on the basis that I secured the account, the Corvette account and

serviced the account." The following facts appear to be undisputed. Defendant specialized in the manufacture of reinforced plastic parts by the bag-molding process. Molded Fiber Glass Body Company manufactured parts by the matched metal die process and was not equipped for bag molding. On March 3, 1953, defendant submitted a bid to Chevrolet with respect to the manufacture of plastic bodies for the Corvette. This contract was awarded to Molded Fiber Glass Body Company. Subsequently Molded Fiber Glass Body Company sublet the contract to defendant. This subcontract was entered into prior to the time plaintiff came into the employ of defendant. Plaintiff's connection with defendant ceased to exist after October 27, 1953. After that date plaintiff rendered no services in behalf of defendant.

The prime contract between defendant and Chevrolet was entered into December 1, 1953. We note that the prime contract called for the same kind of work that had heretofore been performed under the subcontract. We also note that plaintiff called upon officials of Chevrolet relative to getting business for defendant. James S. Lunn testified:

"*Q.* Did you have any subsequent meeting with Mr. Furbacher, and Mr. Wall?   *   *   *

"*A.* September 23d, pardon me, I remember now was the date. I had gone to Detroit for the purpose of visiting Nash-Kelvinator. Mr. Wall and I called on Nash-Kelvinator and then we went to see Mr. Furbacher. I say Mr. Furbacher—I don't know whether we went to see Mr. Klein and found him out or—I think that must have been the case, but we saw Mr. Furbacher.   *   *   *

"*Q.* Could you tell us what was said at that meeting by Mr. Furbacher or Mr. Wall or yourself?

"*A*. We went there to—we wanted to get his reaction to a direct or prime contract and we asked for a direct contract. I don't know whether I said it, asked for it first or Mr. Wall, but we discussed a direct contract and Mr. Furbacher said in essence that they already had a contract with Mr. Morrison and the direct contract would have to be with Mr. Morrison's consent if there was one at all, he was noncommittal about it.   *   *   *

"*Q*. Did you have any further meeting with Mr. Furbacher after September 23d at which Mr. Wall was present?

"*A*. We had a meeting on September 30th.

"*Q*. Tell us who was present at that meeting.

"*A*. Mr. Furbacher and Mr. Klein of Chevrolet and Mr. Morrison and Mr. Morgan Martin of Fiber Glass and Mr. Wall of Lunn and Mr. Scheffler of Lunn Laminates and Mr. Hammond of Owen-Fiberglass Company.

"The purpose of this meeting of September 30th was to discuss the over-all capabilities of Molded Fiber Glass Company with the assistance of Lunn and General Motors to get the production where it was supposed to go in 1954. That was the principal discussion at that meeting.   *   *   *

"*Q*. Prior to the meeting of September 30th, had you ever instructed Mr. Wall to ask Chevrolet for a direct contract to Lunn Laminates?

"*A*. Yes, back in March of 1953.

"*Q*. Did you instruct Mr. Wall to ask for a direct contract at any time after the subcontract from Molded Fiber Glass Company?

"*A*. Not to my knowledge.

"*Q*. Did you ever receive a direct contract from the Chevrolet Division?

"*A*. Yes.

"*Q*. Will you tell us when you received that contract?

"*A.* There is a letter dated November 20th. I don't remember when we received it, 20th or 21st of November we received a contract effective December 1st, a direct contract from Chevrolet. * * *

"The letter from Mr. Klein of November 25, 1953, marked defendants' exhibit E, was the first written indication Lunn Laminates received from the Chevrolet Division that we would receive the direct contract. Between the date of the meeting of September 30th and November 25th, I had a discussion with Mr. Furbacher about a direct contract with Lunn Laminates at a meeting at which Mr. Wall was not present. Between September 30, 1953, and November 25, 1953, I had several discussions with Mr. Klein about a direct contract to Lunn Laminates. Mr. Wall to the best of my knowledge and belief was not present at any of these meetings. Those meetings with Mr. Klein were in Ashtabula; the one meeting with Mr. Furbacher was in Detroit. * * *

"Between the date of my letter of October 3, 1953, to Chevrolet Division about a direct contract and November 25, 1953, I had 3 discussions with Mr. Morrison of Molded Fiber Glass Company about a direct contract to Lunn Laminates. Mr. Wall, between September 30, 1953 and November 25, 1953, did not participate in any of these discussions with Mr. Morrison."

This evidence is not contradicted. The purport of this evidence is that the problem of securing a contract from Chevrolet was still in the negotiation stage at the time plaintiff ceased working for defendant. After plaintiff's discharge negotiations by defendant continued with Chevrolet for a prime contract for approximately 30 days thereafter. We do not find any evidence that plaintiff was the procuring cause of the prime contract. Such proof was lacking at the close of plaintiff's case. The court was in error in denying defendant's motion for a directed

verdict. It follows that the judgment should be reversed, with costs.

DETHMERS, C. J., and KELLY and CARR, JJ., concurred with SHARPE, J.

EDWARDS, J. (*for affirmance*). A review of this record convinces me that there was ample evidence from which the jury could have found that plaintiff "secured" the Corvette contract while still in defendant's employment. Plaintiff obviously played an important role in crucial meetings with Chevrolet which led to defendant becoming a prime contractor. Since the jury obviously found his service a procuring cause of the contract, plaintiff should not be deprived of his sales commission by the fact of discharge prior to the date of signing of the formal contract.

The judgment of the court below is affirmed. Costs to appellee.

SMITH, VOELKER, and BLACK, JJ., concurred with EDWARDS, J.